NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 50

No. 2015-230

| | |
|---|---|
| In re Petition of Rutland Renewable Energy, LLC for Certificate of Public Good Pursuant to 30 V.S.A. § 248, et al. | Supreme Court |
| | On Appeal from Public Service Board |
| | October Term, 2015 |

James Volz, Chair

Alan B. George, Rutland, for Appellants-Neighbors.

Kevin E. Brown of Langrock Sperry & Wool, LLP, Middlebury, for Appellant Town of Rutland.

Kimberly K. Hayden and Danielle M. Changala of Downs Rachlin Martin PLLC, Burlington, for Appellee.


PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.


¶ 1. **DOOLEY, J.** The Town of Rutland ("Town") and five adjoining landowners ("neighbors") appeal from the Vermont Public Service Board's grant of a certificate of public good ("CPG") under 30 V.S.A. § 248 to Rutland Renewable Energy, LLC ("RRE") for construction of the Cold River Solar Project ("Project"), a 2.3 megawatt (Mw) solar photovoltaic electric generation facility. The Town and neighbors argue that the Board incorrectly held that the project will not unduly interfere with the orderly development of the region, will not have an undue adverse effect on aesthetics, and will not have an undue adverse impact on historic sites. We affirm.

¶ 2.	The facts are undisputed.  On December 20, 2013, RRE filed a petition requesting a CPG under 30 V.S.A. § 248 to construct and operate a solar electric generation facility of up to 2.3 Mw AC in the Town.  The facility would be located southwest of the intersection of Cold River Road and Stratton Road, on approximately 15 acres of a larger parcel of land under contract for purchase by RRE.  The parcel is bordered by Cold River Road, "increasing commercial and industrial uses," a vacant wooded parcel, and four homes.  Of the homes, one is separated from the site by a mature hedgerow, one is 150 feet from the project site, one is 280 feet away, and the last is over 500 feet away up a hillside, although it does have a driveway near the site's southernmost corner.  While the parcel is currently an undeveloped open meadow, and the project area does include sections of a Class II wetland and four small Class III wetlands, the parcel is designated as "industrial/commercial" on the Town's Future Land Use Map.  The project would principally include: (1) about 542 solar racks supporting about 10,000 individual panels, although exact wattage, number of panels, and panel configuration will be determined during final design and procurement based on snow and wind analysis; (2) underground electrical lines connecting arrays to combiner boxes and inverters; (3) two 1150 kW inverters with a combined nameplate capacity of up to 2.3 Mw AC; 4) two 1500 kVA step-up transformers or one 2500 kVA step-up transformer; (5) a perimeter fence; and (6) an access area and new curb along Cold River Road to service the northern area, and an extension to an existing access area along the road to service the southern area.  The project would have a 64 foot setback from Cold River Road, with the perimeter fence 15 feet nearer to the road.

¶ 3.	On March 3, 2014, neighbors and the Town were granted permissive intervention by the Board.  The Board appointed a hearing officer to take evidence and render a proposed decision for the Board.  The hearing officer took evidence on each of the relevant requirements for issuing a CPG contained in 30 V.S.A. § 248(b).  The Town and neighbors particularly contested (1) whether the project met the requirement that it "will not unduly interfere with the

orderly development of the region"; (2) whether the project "will not have an undue adverse effect on esthetics"; and (3) whether the project "will not have an undue adverse effects on . . . historic sites". Id. § 248(b)(1), (3), and (5).[1]  As discussed in more detail below, the hearing officer found that the proposal met all the requirements of § 248(b) if certain mitigation measures were in place.

¶ 4.    The Board accepted most of the hearing officer's decision and rationale.  As we discuss below, the Board somewhat modified the rationale on aesthetics and added a mitigation measure.  The Board issued a CPG on March 11, 2015.  Neighbors moved for reconsideration on March 26.  The Board denied the motion on May 6, 2015, elaborating on its decision with respect to aesthetics.  This appeal followed.

¶ 5.    One significant part of the opposition of the Town and neighbors is their reliance on a document entitled Town of Rutland Solar Facility Siting Standards, which were adopted by the Town selectboard on October 22, 2013.  The standards were drafted as an amendment to the Town plan.  On December 19, the Town Planning Commission proposed an amendment to the Town plan incorporating the standards.  The selectboard was expected to adopt the amendment in the summer of 2014.

¶ 6.    The standards, as originally adopted by the selectboard, contain a number of provisions that are related to this appeal and are summarized below:

---

[1]  Section 248(b) contains additional requirements, which are not at issue in this appeal. The Town and neighbors also challenged the project because it is partially sited on primary agricultural soils.  Section 248(b)(5) requires compliance with many, but not all, of the criteria of Act 250.  See 10 V.S.A. §§ 6086(a)(1)-(9).  Criterion 9(B) generally prohibits granting an Act 250 permit if the development will "result in any reduction in the agricultural potential of the primary agricultural soils."  Section 248(b) does not require compliance with criterion 9(B) as part of the CPG process.  The Town and neighbors argued that protection of primary agricultural soils was required by § 248(b)(1), which provides that the project must not "unduly interfere with the orderly development of the region."  The hearing officer and the Board addressed that issue.  Given our resolution of the § 248(b)(1) question, we do not address the effect of siting the project on primary agricultural soils.

3

A. The Town desires to contribute its proportional share to meeting the renewable energy goals in Rutland County, as represented by its share of the land area of Rutland County—2.08%—but "not to exceed that percentage contribution." The siting standards are intended "to avoid and mitigate potential impacts of solar facility development, while promoting new installations in appropriate locations, and achieving proportionality in Rutland Town's contribution to renewable energy solutions."

B. Under General Standards for Energy Projects, the document states that the Town will consider supporting four types of energy development. None of the types include new solar generation facilities. Larger projects must be community-scale "that are designed to meet the expected needs of Rutland Town."

C. Ground-mounted solar projects of a generation capacity of 1.5 kW or greater "shall be located at least 200 feet from any property line and at least 200 feet from any public highway." Renewable energy facility setbacks from property lines or occupied structures should be increased as necessary to mitigate identified aesthetics, historic sites, air and water purity, the natural environment, the use of natural resources, and the public health and safety, with due consideration having been given to . . . Act 250 criteria . . . and nuisances or adverse impacts upon adjoining property owners.

D. Ground-mounted solar energy facilities shall not be "located on primary agricultural soils." Such facilities with a generation capacity greater that 100 kW shall "be located on nonagricultural land."

E. Ground-mounted solar energy facilities "shall not be located within 500 [feet] of a building designated as a historic building."

It is undisputed that the project does not comply "with the property line, roadway, and historic structure setback requirements contained in the Standards." The project site contains a variety of primary agricultural soils; the standards prohibit siting a ground-mounted solar facility on primary agricultural soils. The site has not, however, been used for agricultural production for 15 to 20 years.

¶ 7. In its brief to this Court, the Town raises two principal arguments: (1) the Board failed to accord due consideration to the Town's recommendations that the proposed facility will "unduly interfere with the orderly development of the region" in violation of 30 V.S.A.

4

§ 248(b)(1); and (2) the facility will have an "undue adverse impact" on aesthetics, historic sites, and primary agricultural soils in violation of § 248(b)(5). Similarly, neighbors contend that the project will unduly interfere with the region's orderly development and will have an undue adverse effect on aesthetics and historic sites.

¶ 8. This Court applies a "deferential standard of review in appeals from the Public Service Board." In re Green Mountain Power Corp., 162 Vt. 378, 380, 648 A.2d 374, 376 (1994). We recognize that:

> When the Board evaluates a petition for a CPG under 30 V.S.A. § 248, it is engaging in a legislative, policy-making process. The Board must exercise its discretion to weigh alternatives presented to it, utilizing its particular expertise and informed judgment. We give great deference to the Board's expertise and judgment and accord a strong presumption of validity to the Board's orders. We will affirm the Board's findings unless they are clearly erroneous, and an appellant bears a heavy burden of demonstrating clear error.

In re UPC Vt. Wind, LLC, 2009 VT 19, ¶ 2, 185 Vt. 296, 969 A.2d 144 (citations omitted). This is a highly deferential standard of review. Despite the limited standard of review, "we do not abdicate our responsibility to examine a disputed statute independently and ultimately determine its meaning." In re MacIntyre Fuels, Inc., 2003 VT 59, ¶ 7, 175 Vt. 613, 833 A.2d 829 (mem.).

¶ 9. Under § 248(b)(1), a CPG may be issued for a facility if the Board finds that the facility "will not unduly interfere with the orderly development of the region with due consideration having been given to the recommendations of the municipal and regional planning commissions . . . [and] the recommendations of the municipal legislative bodies." The main thrust of the arguments of the Town and neighbors is that the Board failed to give sufficient weight to the standards adopted by the Town legislative body. We emphasize that the statutory requirement relates to the orderly development of the region, not to a particular municipality within the region. Thus, in UPC Vt. Wind, 2009 VT 19, ¶ 20, we affirmed the Board's analysis of compliance with the requirement based on the overall impact on a three-county region.

5

¶ 10.    We understand that the standard of review to address the Town's opening argument led to a backlash that persuaded the Legislature to amend § 248 to give towns greater control over solar generation facilities.  2015, No. 56, §§ 26a, 26b, 26c.  The new siting requirements in Act 56 were not in place when RRE filed its application or when the Board issued the CPG.  They do not purport to be retroactive.  Thus, we cannot consider the new requirements or the process that led to their enactment.[2]

¶ 11.    Under this provision of § 248(b)(1), the parties have extensively argued the weight to be assigned to the Town solar facility siting standards, the proper interpretation of the Town plan and the interaction between the plan and the solar facility siting standards, the prohibition on siting on prime agricultural soils in the standards, and the setback requirements in the standards.  We do not reach or resolve these arguments.

¶ 12.    There was very little evidence of the project's regional impacts; virtually all the evidence and arguments concerned the impacts on and within the Town.  Indeed, the Board found that the "impacts are primarily localized in nature."  It concluded that "while in some

---

[2]  Act 56 adds requirements in three statutory subsections: 30 V.S.A. § 248(a)(4)(F), id. § 248(b)(1)(B), and id. § 248(s).  Section 248(a)(4)(F) provides legislative bodies and planning commissions the right to appear as a party in a § 248 proceeding.  The Town legislative body appeared in this proceeding.

Section 248(b)(1)(B), allows municipalities to create screening requirements for ground-mounted solar electric generation facilities and requires the Board to impose them unless it finds "that requiring such compliance would prohibit or have the effect of prohibiting the installation of such facility or have the effect of interfering with the facility's intended functional use." Although the adequacy of screening is an issue in this case, the Town has not created screening requirements.

Section 248(s) sets minimum setback requirements for ground-mounted solar electric generation facilities.  Although there has been no adjudication of whether the project here would meet those setback requirements, it appears that it would not meet the minimum setback from a town highway of 100 feet, but would meet the minimum setback from other properties of 50 feet. See 30 V.S.A. § 248(s)(1), (3).  The subsection contains no separate setback requirement for historic sites.   Thus, the fact that the Town siting standards impose a separate setback requirement from a historic building is not reflected in the statute. The subsection does authorize the Board to impose a larger setback requirement, but there is no suggestion that the Board lacks the power to impose a setback requirement under the preexisting law.

6

instances localized impacts may be found to interfere with orderly regional development due to their character or severity, there is no credible evidence in the record that demonstrates that the localized impacts from this particular project would rise to such a level." Neighbors respond that the testimony of their expert witness, a landscape architect, was undisputed and showed the requisite regional impact. Essentially, the witness testified that when a project is "incompatible with the land uses in its setting," it may propagate and have adverse regional impacts, explaining that "no one of those projects will likely have a regional impact, but sprinkling those projects around a town or region without regard to their cumulative impact will certainly have such an impact." Therefore, aside from the prediction of future replication, there was no actual evidence of regional impact. The Board recited the testimony that no one project is likely to have a regional impact and acted well within its discretion in finding the assertion of regional impact inadequate and not persuasive. We affirm the Board's conclusion. Because of our resolution of this issue, we do not reach whether the Board gave "due consideration" to the recommendation of the Town as required by § 248(b)(1).

¶ 13. We next turn to the second set of arguments raised by both the Town and neighbors regarding the undue adverse impact of the solar facility upon aesthetics and historic sites. These issues arise under § 248(b)(5), which provides that the Board must find that the project "will not have an undue adverse effect on esthetics . . . [and] historic sites." We start with aesthetics.

¶ 14. The Board has adopted a modified version of the Quechee test for determining aesthetic impact. The test is named after the decision that first adopted it, In re Quechee Lakes Corp., Nos. 3W0411-EB, 3W0439-EB, slip op. at 19-20 (Vt. Envtl. Bd. Nov. 4, 1985). We have approved the use of the Quechee test by the Board in reviewing a permit for a CPG. See In re Petition of Cross Pollination, 2012 VT 29, ¶ 10, 191 Vt. 631, 47 A.3d 1285 (mem.). The test first asks whether the project will have an adverse effect on scenic and natural beauty in the area

7

in which it is located. Id. It is undisputed that the project here has such an effect. It then asks whether the adverse effect is undue. An adverse impact on scenic and natural beauty is not undue if three conditions are met:

> First, the project must not violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area. Second, it must not offend the sensibilities of the average person. Finally, the applicant . . . must take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings.

Id. (citations omitted).

¶ 15. The Town and neighbors argue that none of these requirements are met. They rely on the setback requirements contained in the Town of Rutland Solar Facility Siting Standards, which they argue are "a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area." As to the second condition, the Town and neighbors argue that the Board improperly failed to consider the effect on the sensibilities of the nearby neighbors. Finally, the parties argue that the Board should have considered imposing a smaller setback as a mitigation requirement.

¶ 16. The Board rejected these arguments, holding that each of the conditions was met and the adverse impact was not undue. With respect to the first element, the Board held that the setback requirements were de facto zoning requirements and could not be considered a community standard because they did not identify an area, and the specific resources in that area, to be protected.

¶ 17. With respect to the first reason, the Board relied upon 24 V.S.A. § 4413(b), which provides that zoning bylaws "shall not regulate public utility power generating plants and transmission facilities regulated under 30 V.S.A. § 248." Setback requirements are a core component of local zoning. See id. § 4411(a)(3) (zoning may regulate "distances to be left unoccupied by uses and structures"). The Town has not, however, adopted a local zoning

8

ordinance, and the solar siting standards were not adopted as a zoning ordinance. Instead they were adopted as a "supporting plan" under § 4403(5) without the process required for the municipal plan.[3] See id. §§ 4382-85.

¶ 18. The Board's holding is a modification of the Quechee test because the test was created for Act 250 review, and such review does not generally supplant local zoning regulation. The Town and neighbors argue that the solar siting standards are "clear written community standards" by any definition of those terms. We might adopt that view if we were dealing with Act 250, where state and local regulatory review coexist. Here, we are dealing with a situation where, under existing law, municipalities have a different role. The effect of the solar siting standards under the theory of the Town and neighbors is to enable the Town to control solar generation siting through the Quechee test. We agree with the Board that a modification of the Quechee test is necessary to give the Board the necessary regulatory power. As the recent amendments to § 248 reflect, the Legislature can change the balance between state and local regulation as it deems appropriate. In the absence of such a statutory change, the Board has the final policy decision. Under the deferential standard of review, we must uphold that policy choice.

¶ 19. We have a similar reaction to the Board's second rationale—that the community standard element is intended to allow the municipality to identify designated areas and resources that need protection. That was the rationale for the Board's decision on aesthetics in UPC Vermont Wind, 2009 VT 9, ¶ 26, and we affirmed the Board's reasoning and conclusion. We

---

[3] The municipal plan is made up, in part, of component plans. Id. § 4382(a). It is unclear whether the component plans are the supporting plans referenced in § 4403(5). In addressing the effect of the siting standards, the hearing officer to the Board concluded that the supporting plans were separate documents and were not required to be incorporated into the municipal plan. Under this theory, there is no specific statutory process for creation of a supporting plan. We note, however, that the term "supporting plan" necessarily means that this plan cannot be inconsistent with the municipal plan. The Board found an inconsistency, and we agree. Presumably, this is why the Town was in the process of incorporating the siting standards in the municipal plan.

similarly affirm it here. The Town never identified the area of this project for special protection to protect aesthetics or scenic beauty. In fact, the municipal plan specified that its future use would be for industrial/commercial development. The site is a low-lying meadow, and the solar panels generally do not interfere with views of surrounding vistas.

¶ 20. We next address the second element: that the project does not offend the sensibilities of the average person. The Board decided that this element was met largely based on the testimony of the expert witnesses. The Town and neighbors argue that the average person for purposes of the test should be put in the position of the close neighbors, and the testimony was that the neighbors' sensibilities were offended. The Board responded that it had considered the visual impact on neighbors but, generally, the test considered the perspective of an average member of the public. It specifically stated that the Quechee test "require(s) that reasonable consideration be given to the visual impacts on neighboring landowners."

¶ 21. We conclude that this issue is controlled by our recent decision in In re VTel Wireless, Inc., 2015 VT 135, ___ Vt. ____, ____ A.3d ____. In that case, neighboring property owners sought to intervene in a CPG proceeding for a communication facility under 30 V.S.A. § 248a, alleging that the project would have an undue adverse effect on aesthetics as viewed from the neighbors' property. The Board denied intervention, and the neighbors appealed. Although the neighbors argued that the Board improperly found his interest to be irrelevant, we concluded that the Board did consider the neighbors' interest but did not consider it sufficient to find the adverse impact on aesthetics undue. Id. ¶ 15 (stating that "[r]egardless" of legal relevance of impact on private parties, the landowners' argument "lacked sufficient weight to raise significant issue" on the merits). We reach a similar conclusion here. In determining whether there has been an undue adverse impact, considering the sensibilities of the average person, the Board can and should consider all vantage points, including from private property.

Here, the Board did consider neighbors' perspective and required extensive screening to mitigate that impact. Under our standard of review, we affirm the decision.

¶ 22. We acknowledge that, in addition to considering neighbors' interest, the Board ruled that the test definition of an average person meant "the average member of the viewing public who would see a particular project from the vantage point of the public;" that is, while the Board must consider all vantage points, it does so from an objective, as opposed to subjective and neighborly, perspective. The Board did, however, specifically address neighbors' specific concerns and interests in its mitigation requirement. Thus, the Board stated:

> [I]n this case RRE has sought to mitigate the aesthetic impacts of the Project through a vegetative screening proposal. Additionally, as discussed below, in recognition of the unique circumstances of the project, we have taken into account the Project's visual impacts on the surrounding property owners and have decided to impose some additional mitigation intended to soften those impacts to the extent possible without unreasonably altering the nature of the Project.
>
> . . .
>
> The Hearing Officer correctly describes Board precedent that holds that while the aesthetics criterion does not guarantee that views of the landscape will never change, it does require that reasonable consideration be given to the visual impacts on neighboring landowners.

The Board went on to impose mitigation requirements to lessen the impact on a particular neighbor additional to those proposed and one added by the hearing officer. We recognize that the Board has, to a certain extent, merged the second and third conditions to determine whether there is an undue adverse impact under the Quechee test, but our point is that its analysis looked separately at the impact on neighbors. We reiterate that this case has essentially the same posture as VTel Wireless, and we affirm it for the same reason.

¶ 23. Finally, on the matter of aesthetics, we consider the third element of the Quechee analysis: whether the applicant has taken generally available mitigation steps. The hearing

11

officer ordered mitigation steps to screen the project from neighbors as proposed by RRE, with several additional measures. The Town and neighbors reargued the need for the full setback as required by the solar facility siting standard as a necessary mitigation measure. The hearing officer found that imposing the setback requirements, including the 500-foot setback requirement required for historic structures would frustrate the project's purpose because it would cause a "very significant reduction in the size and capacity of the array." Before the Board, neighbors argued that the hearing officer failed to consider their alternative request for a setback requirement smaller than that provided in the solar facility siting standards, but greater than the 64 feet proposed by RRE. The Board held that neighbors never proposed an alternative setback requirement. In response to the motion for reconsideration, the Board explained that a witness for neighbors stated "reducing the size of the project should be considered," but never proposed an alternative setback requirement.

¶ 24. We conclude that the Board's ruling is well within its discretion, and the Neighbors did not offer a fully formed proposal for an alternative setback requirement.

¶ 25. The dissent has raised a new argument on this prong of the Quechee test, not raised before the Board. The dissent argues that RRE did not address whether it could mitigate the adverse effect by moving the project to a new site "to improve the harmony of the proposed [project] with its surroundings." Post, ¶ 55. The dissent notes that neighbors had argued that there were alternative sites in more developed, non-residential areas of the town. Post, ¶ 54. In making this argument, the dissent argues that In re Halnon, 174 Vt. 514, 811 A.2d 161 (2002) (mem.), holds that an applicant must show that alternative sites that reduce the adverse aesthetic effect are unavailable.

¶ 26. We disagree that Halnon applies here. In that case, the applicant proposed to site a wind turbine in a location on his sixty-two acres of property that was directly within the view of the Green Mountains from a neighbor's residence. The neighbor argued, and the hearing

12

officer for the Board concluded, that there were better locations on the property for the turbine. Finding that the applicant failed to demonstrate that the alternative locations on the property could not be used to mitigate the adverse aesthetic effect, the Board denied the CPG. We affirmed based on the standard of review. Id. at 518, 811 A.2d at 166.

¶ 27. In this case, the issue is not whether there is an alternative location on the property owned by RRE because the proposal already uses all the available land. The dissent seeks to expand Halnon into a burden to show that there is not a better alternative site anywhere in the town,[4] or at least in any non-residential area of the town, even though RRE does not own or control the land on which the solar project might be sited. In essence, RRE would be required to show that the proposed site for the solar array is the best site in the town, apparently by systematically evaluating and excluding every other possible site.

¶ 28. The burden the dissent would impose on an applicant is unreasonable, and probably unmeetable. We can find no precedent that suggests that it is part of the Quechee test. Moreover, even if the evaluation of other properties were part of the Quechee test, the initial burden to demonstrate an alternative site is on the opponents, not on the applicant. In In re Goddard College Conditional Use, 2014 VT 124, 198 Vt. 85, 111 A.3d 1285, an Act 250 case, a neighbor argued that the applicant failed to show there were not alternative sites for a woodchip heating plant on its property. The only support for considering any alternative site was the neighbor's testimony that a representative of the applicant told her that the applicant had considered and rejected two or three other sites. Id. ¶ 12. We held that the testimony was inadequate to meet the neighbor's initial burden because the "neighbor presented no evidence

---

[4] The dissent does not say that the alternatives evaluated would have to be in the town, and there is no logical reason, other than the cost and extent of the burden in complying, why Town boundaries would control the inquiry. We note that the Town has tried through its solar siting standards to designate where solar generation projects should not be sited, but has not specified where in the town, if any, they should be sited. In fact, as the summary in ¶ 6, supra, shows, at least part of the Town's intent appears to be to exclude large solar projects.

13

that, for example, a suitable alternate site is 'reasonably feasible' (i.e., it would not frustrate the project's purpose or Act 250's goals), or that the alternative satisfies the requirements."[5] Id. If anything, the very general testimony in support of an alternative site here is even weaker than that in Goddard College Conditional Use. By comparison, in Halnon, the neighbor identified specific alternative sites on the applicant's property to which the applicant could move the proposed project, the issue was fully raised and joined before the hearing officer, and the Board denied the CPG. We cannot conclude that neighbors' argument was properly preserved, but, even if it was preserved, we would reject it. We therefore affirm the Board's conclusion that the project met the third element of the Quechee test.

¶ 29. Finally, we reject the argument that the project will have an undue adverse impact on historic sites. As with the Quechee test, the Board follows an Act 250 decision from the Vermont Environmental Board, In re Middlebury College, No. 9A0177-EB (Vt. Envtl. Bd. Jan. 26, 1990), to determine whether the project has an undue adverse impact on historic structures. This test has three parts: (1) whether there are historic structures on the site or nearby that are affected by the project; (2) whether the effect is adverse; and (3) whether the adverse effect is undue. In finding no undue adverse effect, the hearing officer relied upon a historic resources expert witness supplied by RRE, as well as a determination by the Vermont Division for Historic Preservation that the project would have no undue adverse impact on nearby historic resources. The Neighbors argue that the witness who appeared before the Board spoke only to the public's ability to interpret or appreciate the historic qualities of the sites and not to the other three conditions that underlie the third element of the Middlebury College test: failure to take

---

[5]   In Halnon, we assumed that meeting the mitigation requirement could involve relocation of the wind turbine on the applicant's property without examining the issue. In Goddard College Conditional Use, we explicitly declined to rule "whether alternative siting within a project tract may be considered as a reasonable mitigating measure (as opposed to a whole different project not subject to consideration in an Act 250 permitting proceeding)." 2014 VT 124, ¶ 11. We consider the question still open even in the narrow circumstances presented in those cases.

generally available mitigating steps to preserve the character of the site, cumulative effects on the historic qualities by various components which together are so significant they create an unacceptable impact, and violation of a clear, written community standard. Because "it is for the Board, not this Court, to weigh the evidence and assess the credibility of witnesses," UPC Vt. Wind, 2009 VT 19, ¶ 21, we cannot here say that there was inadequate support for the witness' opinion that the project would not have an undue impact on historical resources. We have addressed above with respect to aesthetics the argument that the solar facility siting standards supplied a written community standard and that the mitigation plan proposed by RRE was inadequate. That analysis also applies here. As to the cumulative effects on the historic qualities of the site, we are convinced by the Hearing Officer's and Board's reliance on the entire record including the independent analysis by the Vermont Division for Historic Preservation.

Affirmed.

FOR THE COURT:

_____
Associate Justice

¶ 30. **ROBINSON, J., concurring.** A critical unanswered question in this case is: what does the Board have to do in order to give "due consideration" to the recommendations of municipal legislative bodies and planning commissions pursuant to 30 V.S.A. § 248(b)(1)? The majority does not address this question because it concludes that the dearth of evidence as to the regional as opposed to the municipal or local impact of the project is dispositive.[6] The dissent

---

[6] I concur in the majority's view that 30 V.S.A. § 248(b)(1) expressly calls for consideration of the regional impact of a project, but do not believe that purely local impacts are wholly irrelevant to the Board's analysis. The Legislature would not have required the Board to consider the recommendations of municipal planning and legislative bodies if the municipal impact of a project was irrelevant to the issues before the Board. See id. (requiring the Board to give "due consideration" to recommendations of municipal and regional planning commissions, and municipal legislative bodies, and to land conservation measures contained in any affected

15

persuasively catalogs the Board's myriad slights of the Town's enacted standards, and calls for a "more balanced" approach, but does not grapple with the meaning of "due consideration" and its impact on the scope of our appellate review.

¶ 31. Although I agree with the dissent that the Board indulged every inference against the limitations on siting solar facilities reflected in the Town's standards, and afforded no deference whatsoever to the solar siting standards of the town in which the project was to be located, I concur in the affirmance of the Board's decision because as currently written, § 248(b)(1) does not require any such deference. Nobody contends that the Board here ignored or failed to acknowledge the Town's solar siting standards. The challenge here is to the substance of the Board's treatment of those standards—its explanations of why it declined to assign significant weight to various provisions. The Town's argument boils down to the claim that the Board was insufficiently respectful of the Town's recommendations and input, as reflected in its solar siting standards. But nothing in the plain language of the statute, our prior decisions construing the statute, or the recent legislative debate highlighted by the Town supports the contention that the Board must defer to the Town's recommendations to any degree. Moreover, the Town's suggestion that we review the Board's decision to determine whether it was made in "good faith," is unworkable for several reasons.

¶ 32. To the extent that this lack of deference reflects, as the Town argues, that the Board has "turned a deaf ear" to the concerns raised by towns in connection with solar projects, this Court is not empowered to rewrite the statute to respond to the Town's critique. Resolution of this heated tension between respect for municipal self-determination and the state's policy of aggressively promoting solar power generation falls to the Legislature.

---

municipal plan). For that reason, I concur in the majority's judgment of affirmance, although I do not fully join the majority's reasoning, with respect to the § 248(b)(1) issue. In all other respects, I join the majority's analysis and opinion.

16

¶ 33.    The relevant statute provides that the Board, before issuing a certificate of public good, must find that the project "will not unduly interfere with the orderly development of the region with due consideration having been given to the recommendations of the municipal and regional planning commissions, the recommendations of the municipal legislative bodies, and the land conservation measures contained in the plan of any affected municipality."  Id. § 248(b)(1).  Although the statute calls for "due consideration," of municipal recommendations, it does not purport to describe what consideration is "due" or to identify whether the Board or the Court is the ultimate arbiter of the level of consideration due in a particular instance.  Instead, its admonition that the Board must afford the Town's standards "due consideration" is reminiscent of the phrase, "with all due respect," which invariably precedes and qualifies a statement evincing little to no respect at all.

¶ 34.    The black letter maxims of statutory construction add little to the mix.  On the one hand, if "due consideration" is synonymous with "consideration," then the inclusion of the qualifier "due" is superfluous.  See Trombley v. Bellows Falls Union High Sch. Dist. No. 27, 160 Vt. 101, 104, 624 A.2d 857, 860 (1993) ("[W]e presume that language is inserted in a statute advisedly" and thus "do not construe the statute 'in a way that renders a significant part of it pure surplusage.' " (citations omitted)).

¶ 35.    On the other hand, if something more than mere "consideration" is required of the Board, the Legislature has offered no insight into what that may be.  The Legislature knows how to require an agency to defer, conditionally or completely, to the judgment of another body.  See, e.g., 24 V.S.A. § 2787(1) (requiring executive branch to defer to plan of regional economic development commission in distributing certain funds, or to provide regional planning commission with its basis for not deferring); 10 V.S.A. § 6086(d) (describing that in Act 250 permitting process, "technical determinations of the Agency [of Natural Resources] shall be accorded substantial deference" by district commissions); id. (stating that "district

17

commission[s], in accordance with rules . . . , shall accept" certain determinations by development review board with respect to review of municipal impacts, creating presumption that application is or is not detrimental to public health and welfare with respect to specific requirement for which it is accepted); 16 V.S.A. § 806k(d) (stating that in connection with interstate compact on educational opportunity for military children, "court shall give deference to the actions of the Interstate Commission consistent with applicable law and shall not find the rule to be unlawful if the rule represents a reasonable exercise of the Interstate Commission's authority"). An Act 250 permit may not be issued unless the project is "in conformance with any duly adopted local or regional plan." 10 V.S.A. § 6086(a)(10). Yet the Legislature has not included in § 248 any language suggesting that the Board must afford any deference to the Town's recommendations, explain its departure from those recommendations, or ensure that the project conforms to the Town's recommendations. See Morin v. Essex Optical/The Hartford, 2005 VT 15, ¶ 7, 178 Vt. 29, 868 A.2d 729 ("[W]e will not read terms into the statute unless necessary to make the statute effective.").

¶ 36. In fact, the permitting process pursuant to § 248 preempts municipal zoning requirements altogether—an aspect of the statutory structure that further undermines any suggestion that the Board owes deference to the Town's solar siting standards. See City of S. Burlington v. Vt. Elec. Power Co., 133 Vt. 438, 447-48, 344 A.2d 19, 25 (1975) (holding municipal zoning regulation of transmission line preempted by state regulatory authority). On balance, the plain language of the statute requires that the Board consider and perhaps even address the Town's recommendations as to the effect of the project on development in the region. Beyond that, the statute does not require the Board to give any particular weight to the Town's recommendations beyond that weight the Board, within its discretion, deems to be "due."

18

¶ 37. This Court has never held that "due consideration" requires deference to the municipality. See, e.g., In re UPC Vt. Wind, LLC, 2009 VT 19, ¶ 17, 185 Vt. 296, 969 A.2d 144 ("Under the plain terms of the statute . . . the Board need only give 'due consideration' to the recommendations of the municipal and regional planning commissions in deciding [if] the project will not unduly interfere with the orderly development of the region."); City of S. Burlington, 133 Vt. at 447, 344 A.2d at 25 (" 'Due consideration' for municipal legislative bodies . . . at least impliedly postulates that municipal enactments, in the specific area, are advisory rather than controlling."); Petition of Vt. Elec. Power Co., 131 Vt. 427, 435, 306 A.2d 687, 692 (1973) ("[T]he Board extended to the Planning Commission the same opportunity to be heard as the other parties and due consideration was given to the recommendations of the Planning Commission. Thus, on this record, we conclude the Board complied with the requirements of 30 V.S.A. § 248(b)(1).").

¶ 38. The Legislature's 2015 changes to the statutes regulating solar siting, cited by the Town, likewise does not support the view that "due consideration" requires a modicum of deference to the Town's solar standards. The Town notes that in 2015, in response to growing controversy about municipal authority, or the lack thereof, in the siting of renewable energy generation projects, the Legislature changed the applicable law to provide more municipal input into the process. However, the changes cited by the Town do not alter the "due consideration" standard or suggest that it incorporates an element of deference.

¶ 39. Rather, the 2015 amendments reinforce the Town's limited role in light of the "due consideration" standard. The amendments gave the legislative body and planning commission for the municipality in which a facility is located party status in proceedings under § 248(a), 2015, No. 56 § 26a; established minimum setback requirements and authorized the Board to approve smaller setbacks upon agreement of the applicant, each adjoining owner, and the municipal legislative body, id. § 26b; and required that projects comply with screening

19

requirements of municipal bylaws or ordinances unless the Board finds that requiring such compliance would prohibit or have the effect of prohibiting the installation of such a facility or have the effect of interfering with the facility's intended functional use, id. § 26c-26e. The Legislature enacted these amendments to the statute after we had repeatedly held that the "due consideration" standard means that a municipality's enactments are "advisory," two months after the Board decision in this case, and in the context of acknowledged public controversy about the lack of municipal control over local solar siting. It left the "due consideration" provision intact, even though it amended other language in § 248(b). Although legislative inaction following judicial construction of a statute may be "of small consequence where the statute or its contemporaneous interpretation was not called to the legislature's attention," Lake Bomoseen Ass'n v. Vt. Water Res. Bd., 2005 VT 79, ¶ 21, 178 Vt. 375, 886 A.2d 355, under the circumstances present here, the Legislature's retention in 2015 of the "due consideration" standard undermines the argument that the Legislature intended for § 248(b)(1) to require deference to municipal solar siting standards.[7]

¶ 40.    The Town's more modest position that the Board's "due consideration" requires, at a minimum, that it analyze the recommendations and limitations reflected in the Town's solar

---

[7] Moreover, the 2015 amendments delineate a very specific and circumscribed subject matter—screening—with respect to which municipalities are now entitled to some deference. The specificity of the 2015 amendments regarding the deference that now is due to certain municipal enactments reinforces that municipalities still enjoy no particular deference regarding solar siting more generally. See, e.g., State v. Eldert, 2015 VT 87, ¶ 27, __ Vt. __, 125 A.3d 139 (recognizing maxim of statutory interpretation that "the expression of one thing is the exclusion of another"). Given the content of the 2015 amendments, they cannot be viewed as clarifying the Legislature's intent regarding municipal authority over solar siting to support the contention that the law requires deference to the Town's solar siting standards generally. I note that contemporaneous with this Court's consideration of this case, the Legislature has been in the throes of squarely addressing the degree of deference to be afforded municipal development plans in solar siting. See S.230, An act relating to improving the siting of energy projects, passed by the Senate on March 31, 2016, SJ 124 P. 760. If ultimately passed, this legislation may significantly impact the deference due to municipalities in the solar siting process on a prospective basis. As of the date of this decision, the Legislature's consideration of this bill has not run its course.

siting standards "in good faith" is unworkable for several reasons. First and foremost, as an appellate review body, I do not believe this Court is well positioned to evaluate the subjective good faith of members of the Board. And absent extraordinary circumstances, I personally would be loath to accuse another tribunal of "dishonesty of belief, purpose or motive." See Black's Law Dictionary at 149 (10th ed. 2014) (defining bad faith).

¶ 41. Second, the "bad faith" standard for evaluating "due consideration" would shift our focus from the ordinary questions we customarily consider on review: Were the Board's factual findings clearly erroneous? Did its conclusions flow from its findings? Did it err in interpreting the law? And was its determination within its broad discretion? A Board decision based on findings that are unsupported by the evidence, conclusions that do not flow from the findings, or an erroneous interpretation of the law may be subject to reversal for those reasons, without the need to analyze the Board's motivations. On the other hand, a decision that falls within the Board's broad discretion that is based on accurate understandings of the applicable law, conclusions that flow from the Board's findings, and findings that are supported by the evidence, is affirmable without the need to consider the subjective motivations of the members of the Board. See 30 V.S.A. § 11(b) (stating that on appeal to Supreme Court, Board's "findings of fact shall be accepted unless clearly erroneous"); Petition of New England Tel. & Tel. Co., 159 Vt. 459, 461-62, 621 A.2d 232, 235 (1993) (stating that where Board's findings " 'fairly and reasonably' support the agency's conclusions of law, this Court will uphold the agency's decision" (citation omitted)).

¶ 42. Perhaps most important, evaluating the subjective motivations of the Board in this case would thrust this Court into the center of an intense policy debate and accompanying political maelstrom to address a contentious issue squarely within the province of the Legislature. The Town has painted a compelling picture of a Board aggressively pursuing solar project development in response to targets established by the Legislature for the development of

renewable energy, and frustrated municipalities all around the state that feel "ignored" and "steamrolled" by the Board. Whether the current statutory scheme, which gives the Town the opportunity to have plans and recommendations considered by the Board but does not assign any particular weight to the Town's position, strikes the best balance between the goal of developing more renewable energy generation capacity in Vermont and respect for local regulation of land use is a political and policy question appropriately directed to the Legislature. In fact, as noted above, the Legislature is presently in the midst of considering a bill that squarely addresses the question. As this Court explained in another context, "If the provisions of [the statute] seem unfair or unjust, the remedy is to change the law itself. This can be effected by the legislature and should not be done by judicial fiat under the guise of statutory interpretation." Riddel v. Dep't of Emp't Sec., 140 Vt. 82, 88, 436 A.2d 1086, 1089 (1981); see also Sirloin Saloon v. Dep't of Emp't & Training, 151 Vt. 123, 129, 558 A.2d 226, 229 (1989) ("[T]he policy issue is for the Legislature, not this Court, whereas here the statute is plain on its face.").

¶ 43. For these reasons, I concur in the majority's affirmance, and the majority's reasoning on all points, except that I do not join the majority's analysis of whether the Board complied with § 248(b)(1) to the extent that the majority rests its analysis entirely on the lack of evidence concerning the impact of this project on the orderly development of the region.

_____
Associate Justice

¶ 44. **REIBER, C.J., dissenting.** I cannot agree with the majority that the Public Service Board gave due consideration to the Town of Rutland's recommendations for this solar energy project or sufficient regard to the Town's standards for preserving the project area's natural beauty and aesthetics, as required by law. The choice confronting the Board here was not between yielding to the Town's solar-energy standards or simply disregarding them. "Due

22

consideration" of the Town's recommendations and concerns required a more balanced approach which, if properly applied, might well have produced a different result. Accordingly, I respectfully dissent.

¶ 45. The Board here relied heavily on this Court's observation in City of South Burlington v. Vermont Electric Power Company that the "due consideration" which the Board must give to the Town's recommendations under 30 V.S.A. § 248(b)(1)[8] "impliedly postulates that municipal enactments, in the specific area, are advisory rather than controlling." 133 Vt. 438, 447, 344 A.2d 19, 25 (1975). What this means in practical terms is essential to determine whether the Board fulfilled its statutory obligation. Here, the Town's "recommendations" were based largely on its standards. These were duly enacted by the Town's selectboard in 2013 when it became aware of plans for industrial-sized solar energy projects within the Town that its current land-use plan, due to expire the following year, did not contemplate or address. In specifically declining, therefore, to address "the weight to be assigned to the Town solar facility siting standards," the majority evades the most important issue for decision. Ante, ¶ 11.

¶ 46. It is not an issue that the Board itself evaded. On the contrary, a fair reading of the Board's decision makes it clear that it viewed the standards as little more than obstructionist and borderline illegitimate, and weighted them accordingly. The Board hearing officer focused on what he perceived to be a telling "inconsistency" between the designation of the project area as "Industrial/Commercial" in the Town's land-use plan and the solar standards' goal of preserving the prime agricultural land on which project was indisputably located. The hearing officer also questioned the standards' failure to prohibit other kinds of development on

---

[8] This section provides, in part, that before the Board may issue a CPG, it must find that the project "will not unduly interfere with the orderly development of the region with due consideration having been given to the recommendations of the municipal and regional planning commissions, the recommendations of the municipal legislative bodies, and the land conservation measures contained in any plan of any affected municipality." 30 V.S.A. § 248(b)(1).

agricultural soil, demanding to know why that would be acceptable while "the modest, temporary, and reversible impacts" from 542 free-standing solar arrays would not. And finally, the hearing officer concluded that the standards were essentially meaningless as applied to the project site because it had not actually been used for agricultural production for fifteen or twenty years.

¶ 47. The Board embraced the hearing officer's reasoning, stating: "Th[e] analysis reflects the due consideration afforded by the Hearing Office of the Town's recommendations, and we agree with the Hearing Officer's reasoning." The Board also emphasized that the standards' siting requirements would "severely limit ground mounted solar development on existing land within the Town" and thereby frustrate "Vermont's legislated policy goals supporting the deployment of in-state renewable generation facilities." Although the Town established that substantial land within the town remained available for solar energy projects, the Board found this to be "an unlikely proposition." Testimony by a town lister and planning commission member, as well as a professor at Lyndon State College, that a poorly sited major energy facility would have an adverse domino effect on the region as a whole was summarily rejected as "speculative."

¶ 48. In light of these findings, the Board's self-serving statement that merely because the hearing officer "chose not to follow the recommendations in the Standards does not compel the conclusion" that he failed to give them "due consideration" is disingenuous, at best. As shown, the hearing officer viewed the relevance, if not indeed the very validity, of the Town's recommendations with skepticism, and the Board expressly adopted the hearing officer's reasoning.

¶ 49. This was error. It is one thing to evaluate the merits of a town's recommendations concerning the regional and environmental impacts of an energy project, quite another to question their legitimacy and underlying motivation. When a town appears before the Board and

24

states its recommendations, "due consideration" at least requires a respectful, evenhanded, and balanced hearing. This did not occur. Furthermore, while the legislative policy in favor of renewable energy projects may constitute a valid consideration for the Board, it should not—as this decision implies—color every aspect of the decisionmaking process.

¶ 50. A similar failing informed the Board's consideration of the project's impact on the aesthetics and natural beauty of the area, under 30 V.S.A. § 248(b)(5). All of the parties here agreed that the project would be out of character with the area—an area which, despite its zoning designation, was "currently characterized by a mix of agricultural use, low density residential and forested land." There was no dispute, therefore, that the project's visual impact and siting would have an adverse aesthetic impact on the area. See In re Petition of Cross Pollination, 2012 VT 29, ¶ 10, 191 Vt. 631, 47 A.3d 1285 (mem.) (affirming two-step Quechee analysis which asks first whether project "will have an adverse impact on scenic and natural beauty" and second "whether this adverse impact would be undue" (quotations omitted)).

¶ 51. In determining whether that impact would be undue, however, the Board again displayed a basic lack of fairness. The first criterion under the Quechee test is whether the project would "violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area." Id. The Town again relied on its solar standards, developed expressly to address concerns about the effect of solar-energy facilities "on the town's residential neighborhoods and its scenic, natural, agricultural, and historic resources." Once again, however, the hearing officer and the Board gave them little or no consideration. Their reasoning was that the solar standards did not represent "clear, written community standards for purposes of aesthetics review under § 248" because the specific setback requirements "constitute[d] a de facto zoning bylaw" from which the project was exempt;[9] the Town land-use plan did not

---

[9] Under 24 V.S.A. § 4413(b), zoning bylaws may "not regulate public utility power generating plants and transmission facilities regulated under 30 V.S.A. § 248."

contain a specific provision to preserve the scenic beauty of the project site; and the standards themselves did not identify the specific project site "as a scenic resource worthy of protection." The majority here accepts these arguments and adds that the Board was justified in a applying a "modified Quechee standard" favoring the project because strict application of the solar standards would "enable the Town to control solar generation siting" despite its acknowledged "secondary" role. Ante, ¶ 18.

¶ 52.    As a basis to deny consideration of the Town's solar standards, these arguments are decidedly weak.  As the majority notes, the standards were formally adopted by the Town as a "supporting plan" to guide solar energy development under a process expressly authorized by statute.  24 V.S.A. § 4432.  It is not necessary to re-label them as "zoning bylaws" to ensure continued state preeminence in the field of solar energy development.  A "modified" Quechee standard would balance state energy priorities with legitimate local concerns not by rejecting enactments like the solar standards but by exploring ways to accommodate them.  The Board's review process afforded ample flexibility, for example, to determine that larger setbacks were necessary to mitigate the project's adverse scenic impacts without necessarily concluding that absolute compliance with the Town's solar standards was a prerequisite to approval.

¶ 53.    Moreover, as noted, the standards were enacted to supplement the Town's land-use plan; it is pointless, therefore, to suggest that they were undeserving of the Board's consideration because they contain conservation provisions not contained in the plan.  Nor is it any more logical to conclude that the standards were deficient in failing to identify "this particular parcel as a scenic resource"; they were written to apply to the town as a whole, and set forth general standards to preserve scenic beauty and natural resources—including rules relating to buffering, agricultural soils, and setbacks from highways and wetlands—that were directly applicable to the project site.

¶ 54. Equally one-sided was the Board's consideration of the third Quechee criterion—whether the applicant has taken all reasonable "mitigating steps" to ameliorate the project's adverse aesthetic effect. See Cross Pollination, 2012 VT 29, ¶ 10. The Town and neighbors here advanced a number of suggestions to mitigate the project's adverse impacts, ranging from alternative sites in more developed, non-residential areas of the town to a smaller project that would comply with the solar standards' setback provisions.[10] The Board, however, declined to consider any alternative sites, and summarily rejected the "feasibility" of any smaller project based on little more than the hearing officer's assertion that compliance with the setback standards would "undoubtedly 'frustrate the project's purpose.' "

¶ 55. This does not, in my view, demonstrate adequate consideration of whether the applicant has taken all reasonable steps to mitigate the project's adverse aesthetic impact. In In re Halnon, the Board denied a CPG for a wind turbine based, in part, on its finding that the applicant had failed to take reasonable mitigating steps to ameliorate the adverse aesthetic impacts of the project. 174 Vt. at 518, 811 A.2d at 166. There, as here, the project's neighbors advanced a number of alternative sites, and the Board found that the applicant had "failed to present any compelling reason why he could not use an alternative site" as well as failed to take mitigating steps to improve the harmony of the proposed turbine with its surroundings. Id. at 515, 811 A.2d at 163. As the Board there observed, the applicant had the "burden of proof in this case and has failed to demonstrate this mitigation would be unreasonable." Id. at 515-16, 811 A.2d at 163.

---

[10] The Town argued that "[h]onoring the 200-foot setback requirement of the . . . Standards would have done much to increase the harmony of the project with the surrounding neighborhood." Neighbors also argued that setbacks larger than the 64-foot buffer proposed by the applicant would be reasonable given "the contribution the [site's] open meadow makes to the views of surrounding residents." Neighbors also adduced testimony from two witnesses concerning two alternative sites, one a large, 500-acre former gravel pit that the owner was interested in developing for solar energy, the other a 20-acre site owned by one of the neighbors who was similarly interested in developing the site for solar energy.

¶ 56. On appeal to this Court, the applicant claimed the Board had abused its discretion and violated state policy in favor of renewable energy by "putting the burden of proof upon him to show that mitigation would be unreasonable, and denying his application for failure to meet that burden." Id. at 517. We rejected the contention, finding no error in the Board's decision to deny the CPG "when [the applicant] failed to provide evidence that he had taken significant steps to minimize the negative effects that the project would have on the [neighbors'] view, . . . failed to present specific evidence supporting his contentions that siting the turbine at alternative locations caused problems and increased costs," and indeed "conducted no analysis of alternative sites."[11] Id.

¶ 57. The same failings were evident here. Apart from one witness's summary assertion that even the slightest reduction in the project's size would be unreasonable,[12] the Board cited no evidence to show that a smaller solar array would frustrate the project's purpose or that placement of the project at the alternative sites would not be feasible. This was not adequate, in my view to address the concerns raised by the Town and neighbors. Accordingly, I

_____

[11] Although a specific statute places the burden on the party opposing an Act 250 permit to show an "unreasonable or adverse [aesthetic] effect," 10 V.S.A. § 6088(b), this provision is not expressly incorporated into the CPG review process under 30 V.S.A. § 248. Furthermore, while this Court has not definitively ruled on whether alternative sites may be viewed as a reasonable mitigating measure in Act 250 proceedings, Goddard College, 2014 VT 124, ¶ 11, there is no question that the Board has considered them to be appropriate for consideration in CPG proceedings, as evidenced by its decision in Halnon and many other administrative rulings. See, e.g., In re New Cingular Wireless, LLC, No. 7998, 2013 WL 871477, at *4 (Pub. Serv. Bd. Mar. 4, 2013) (concluding that applicant "has performed due diligence by investigating fourteen alternative locations for the Project, only to conclude that these sites would not satisfy the coverage obligation"); In re SBA Towers III, Inc., No. 7868, 2012 WL 2061807, at * 4 (Pub. Serv. Bd. June 5, 2012) (noting that applicant had "evaluated alternative sites for the Project to accommodate neighboring landowners' concerns regarding aesthetic impacts"); In re Application of Champlain Orchards, NM-1621, 2011 WL 6122575, at * 4 n.4 (Pub. Serv. Bd. Dec. 2, 2011) (concluding that, based on evidence presented, there was "no need to continue to the second prong of the [Quechee] analysis that would have examined possible mitigation measures including alternative locations for siting the project").

[12] The Director of Community Planning and Design for the applicant acknowledged that he "consider[ed] any reduction in the size—the number of panels—a frustration of the project's purposes."

would remand this matter to the Board with directions to afford a more balanced consideration of the project's impact on the region in light of the Town's solar standards and recommendations, and to address—and if necessary take additional evidence—on whether larger setbacks, a smaller project, or an alternative location would represent reasonable mitigation measures.

¶ 58.    I am authorized to state that Justice Eaton joins this dissent.


_____

Chief Justice